**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Karmen Thornton,

Plaintiff,

v.

Ethicon Incorporated, et al.,

Defendants.

No. CV-20-00460-TUC-JCH

**ORDER**

This is a products liability action involving a pelvic mesh device made by Defendants Ethicon, Inc. and Johnson & Johnson. Plaintiff Karmen Thornton received an implant of Defendants' TVT-O[1] device and claims that it was defective and injured her. Plaintiff sued in May 2016 as part of a multidistrict litigation ("MDL") proceeding in the United States District Court for the Southern District of West Virginia (Doc. 1). *See In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, MDL No. 2327 (S.D. W. Va. 2012). Her case was included in Wave 11 in the MDL Court. (Doc. 81 at 17.) Her case was transferred to this Court on October 28, 2020. (Docs. 47, 61.)

The following claims remain for trial: Strict Liability—Design Defect (Count V), Discovery Rule and Tolling (Count XVIII) and the portion of the negligence claims (Counts I, X, and XIV) to the extent they are based on negligent design defect. (Doc. 101 at 28-29.) Defendants filed a motion to exclude the expert opinion of Dr. Elizabeth Laposata under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*,

---

[1] Transobturator urethral sling. (Doc. 37 at 1.)

509 U.S. 579 (1993). (Doc. 111.) The motion is fully briefed. (Docs. 114, 119.)[2] For the reasons set forth below, the motion will be granted in part and denied in part.

## I. RELEVANT BACKGROUND

Plaintiff underwent a hysterectomy and was implanted with Defendants' TVT-O[3] mesh device by Dr. Vicki Sherman on July 13, 2006. (Doc. 1 at 4; Doc. 37 at 1.) She underwent these procedures for the treatment of stress urinary incontinence ("SUI"), abnormal uterine bleeding, and uterine fibroids. (Doc. 37 at 1.) After implantation of the TVT-O device Plaintiff suffered from chronic pelvic pain and dyspareunia.[4] *Id*.

On October 6, 2015, Plaintiff saw Dr. Sherman and expressed concern that her pelvic pain may be due to her bladder mesh. *Id*. at 145-146. Dr. Sherman examined Plaintiff and did not notice any problems with the TVT-O mesh. (Doc. 37-2 at 36-37.) At that visit, Dr. Sherman told Plaintiff that her pelvic pain was muscular in nature and not related to the mesh. *Id*. at 37. In 2016, Plaintiff saw Dr. Christian Twiss who determined her TVT-O device had eroded into her vaginal wall. (Doc. 97-2 at 45, 154.) On March 18, 2016, Dr. Twiss performed a transvaginal excision of the TVT-O device, bilateral groin exploration for sling excision and cystourethroscopy for her urethral sling. (Doc. 37 at 1-2.)

## II. DEFENDANTS' MOTION

While this case was pending in the MDL, Plaintiff's expert Elizabeth Laposata, M.D., F.C.A.P., F.A.S.C.A.P., was disclosed as an expert pathologist on the issue of case-specific medical causation. (Doc. 111-2 at 3.) Defendants seek to preclude Dr. Laposata from offering general causation opinions contending that her general causation opinions are beyond the scope of her case-specific expert designation. (Doc. 111 at 2.) Defendants also move to preclude Dr. Laposata from offering her case-specific opinion that Plaintiff's TVT-O degraded in vivo and that her alleged clinical complications were caused by the mesh. *Id*. Defendants assert that these opinions are unreliable and beyond the scope of Dr. Laposata's qualifications as a pathologist. *Id*. They argue that Dr. Laposata's specific

[2] Oral argument will not aid the Court's decision and the request for oral argument is denied. *See* Fed. R. Civ. P. 78(b).
[3] Transobturator urethral sling. (Doc. 37 at 1.)
[4] Pain with intercourse.

causation opinions are unreliable because: (1) she is not qualified to offer such opinions; (2) she did not utilize a control; (3) she did not conduct any testing to determine the composition of the surface layer of the mesh fibers contained in the slides; and (4) she failed to conduct a proper differential diagnosis. *Id.* at 5-8. Plaintiff opposes Defendants' motion. (Doc. 114.)

## III. LEGAL STANDARD

Rule 702, Fed. R. Evid., provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 104(a), Fed. R. Evid., requires the proponent of the expert testimony to show by a preponderance of the evidence that the proposed testimony is admissible under Rule 702. *See* Fed. R. Evid. 104(a); *McBroom v. Ethicon, Inc.*, No. 2:20-cv-02127-DCG, 2021 WL 2709292, at *2 (D. Ariz. July 1, 2021) (citing *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007)). "The trial court acts as a gatekeeper for expert testimony to assure that it 'both rests on a reliable foundation and is relevant to the task at hand.'" *McBroom*, 2021 WL 270929, at *2 (quoting *Daubert*, 509 U.S. at 597; *Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3-4 (D. Ariz. Aug. 2, 2019)). "It is not the job of the [c]ourt to ensure that the evidence heard by the jury is 'error free,' but to ensure that it is 'sufficiently reliable to be considered by the jury." *McBroom*, 2021 WL 2709292, at *4 (quoting *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX-DCG, 2018 WL 495607, at *4 (D. Ariz. Jan. 22, 2018) (citation omitted); *In re Transylol Prods. Liab. Litig.*, No. 08-MD-01928, 2010 WL 14889793, at *7 (S.D. Fla. Feb. 24, 2010) ("The [c]ourt must be careful not to conflate questions of admissibility of expert testimony with

the weight appropriately to be accorded to such testimony by the fact finder.”)).

Rule 702 “contemplates a broad conception of expert qualifications.” *Parks v. Ethicon, Inc.*, No. 20-CV-989 TWR (RBB), 2020 WL 6118774, at *2 (S.D. Cal. Oct. 16, 2020) (quoting *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004)). “Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.” *Parks*, 2020 WL 6118774, at *2 (quoting *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)).

## IV. ANALYSIS

### a. Dr. Laposata

Dr. Laposata is a forensic pathologist and as of June 17, 2019, the date of her expert report in this case, she held faculty positions as Clinical Associate Professor of Pathology & Laboratory Medicine at Brown University School of Medicine and as Adjunct Professor of Biomedical Forensic Sciences at Boston University School of Medicine. (Doc. 114-1 at 2, 15.) She has prior experience as a medical examiner. *Id*. at 2-3. Dr. Laposata explains in her report that “pathology is the study of the effects of diseases and injuries on the tissues, organs and fluids of the human body[]” and includes examining tissues under a microscope “to diagnose changes in those tissues that result from disease and/or injury.” *Id*. at 3. Forensic pathology concentrates “on concerns that establish the causes of injuries and/or disease processes often focusing on questions generated in the legal arena.” *Id*.

Dr. Laposata was asked to “examine the surgical pathology slides prepared from tissues and material removed from [Plaintiff] to determine whether the specimens reveal abnormal tissue reactions and, if so, to determine the cause(s).” *Id*. She was also asked to “identify the anatomic, physiologic, and pathologic events that resulted in the production of clinical signs and symptoms observed by the treating physician(s) and experienced by [Plaintiff].” *Id*. Upon her review of Plaintiff’s pathology slides, along with her consideration of the relevant literature, Dr. Laposata found that the “histologic picture is consistent with the adverse tissue effects of the mesh.” *Id*. at 14. Dr. Laposata found similar findings present in Plaintiff’s pelvic mesh “resected from the right and left slides of the

sling causing bilateral pelvic pain and dysfunction." *Id*. Dr. Laposata's findings continued:

> Bridging fibrosis connects mesh filaments causing mesh contraction and mesh movement through pelvic tissues. Nerves encased in fibrous tissue are stimulated and cause unnecessary pain. Skeletal muscles that are trapped in the fibrous tissue cause pelvic dysfunction and also indicate degeneration of nearby skeletal muscle tissue. Moderate chronic inflammation around the mesh filaments denotes continued unfavorable tissue reaction to the filaments. Some filaments show surface degradation that releases harmful substances into the tissue. All abnormalities in the tissue were related to the mesh, and there was no other evidence of alterations or abnormalities in the tissues.

(Doc. 114-1 at 14.) She opined "to a reasonable degree of medical certainty that the complications suffered by [Plaintiff], including dyspareunia, pelvic pain, urethral pain, and vaginal bleeding are consistent with her pathological findings and were the result of the mesh and associated tissue changes caused by the mesh." *Id*. at 15.

**b. Application of Rule 702 to Dr. Laposata's Opinions**

**i. General Causation Opinion**

Defendants argue that Dr. Laposata should be precluded from offering general causation opinions because she has not been designated as a general causation expert. (Doc. 111 at 3-4.) They assert that Plaintiff "clearly designated Dr. Laposata on the issue of specific causation alone" and her testimony should be limited thusly. *Id*. Defendants rely upon *In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, No. 2:12-cv-00737, 2016 WL 7242550, at *2 (W.D. Va. Dec. 14, 2016).

Plaintiff urges that Dr. Laposata "does not hold herself out as a general causation expert." (Doc. 114 at 3.) She contends that Dr. Laposata's report offers "some general background on the basic science and pathology of tissue reactions to foreign biomaterials and descriptions of changes in tissue after mesh implantation." *Id*. She explains that this general information is a necessary foundation "to provide a basis upon which her case specific opinions are founded[]" and is essential to the jury's understanding of her testimony. *Id*. Plaintiff relies upon *Meade v. Ethicon, Inc.*, No. 4:20-cv-00694, 2020 WL 6395814, at *8 (E.D. Ark. Nov. 2, 2020).

The district court in *Meade* rejected the argument that Defendants make in this case. That court found that while Dr. Laposata's report offered "some general background on the basic science of pathology of tissue reaction to foreign biomaterials and descriptions of changes in tissue after mesh implantation[,]" this general information was provided to "show how this information correlates with physical symptoms of the sort Ms. Meade experienced and to provide a basis upon which her case-specific opinions are founded." 2020 WL 6395814, at *8.

Here, this Court finds that based upon Plaintiff's Designation and Disclosure of Case-Specific Expert Witnesses that was filed in the MDL Court Dr. Laposata was disclosed as a case specific expert. (Doc. 111-2 at 2-3.) The Court also finds that, like the district court in *Meade*, Dr. Laposata does not hold herself out as a general causation expert. As in *Meade*, Dr. Laposata's report in this case explains in some detail the basic science and pathology of tissue reaction to foreign biomaterials, the changes in tissue after mesh implantation, and the pathology correlation with physical symptoms. (Doc. 114-1 at 4-8.) However, Dr. Laposata's opinions are limited to her examination of Plaintiff's tissue samples in light of the broader background information laid out in her expert report. *Id*. at 14-15.

*In re Ethicon, Inc.*, does not persuade the Court otherwise. *In re Ethicon* is a decision issued by District Judge Goodwin wherein the MDL Court found that the plaintiff's expert was not designated and disclosed as a general causation expert. 2016 WL 7242550, at *2. Judge Goodwin held that "[a]t trial, counsel must tailor Dr. Galloway's expert testimony to only his specific causation opinions applicable to Hs. Harter's case." *Id.*

As set forth above, the Court finds that Dr. Laposata's ultimate opinions are case-specific to Plaintiff and that Dr. Laposata does not offer general causation opinions. Defendants' motion in this regard will be denied.

/ / /

/ / /

/ / /

**ii. Specific Causation Opinions**

**1. Opinion that Clinical Complications were Caused by the Mesh**

Defendants argue that Dr. Laposata's opinion that Plaintiff's clinical complications were caused by her pelvic mesh is beyond the scope of her qualification as a pathologist. (Doc. 111 at 5.) They urge that because Dr. Laposata is an anatomical and forensic pathologist and previously worked as a medical examiner, and not as a clinical physician, her opinion that Plaintiff's clinical complications were caused by her mesh should be excluded as beyond the scope of her qualifications. *Id.* They rely upon *Ellis v. Ethicon, Inc.*, No. 2:20-cv-223-CEA-HBG, 2021 WL 4302339, at *4 (E.D. Tenn. Sept. 21, 2021). (Doc. 119 at 3.)

Plaintiff argues that other courts have rejected Defendants' argument finding Dr. Laposata qualified to opine on a plaintiff's clinical complications. (Doc. 114 at 4.) She again relies upon *Meade*. *Id.* In *Meade*, the district court recognized that "Dr. Laposata is a board-certified pathologist with over 30 years of experience examining tissue from various parts of the human body to identify and determine the cause of injuries, diseases and death and with extensive recognition in the field." *Meade*, 2020 WL 6395814, at *8. Finding Dr. Laposata qualified to opine on the cause of the plaintiff's clinical complications, *Meade* reasoned:

> . . . the [c]ourt considers it within the expertise of a pathologist to opine as to pain. Dr. Laposata studies human tissue and determines cause of injuries and diseases, and Dr. Laposata both works as a pathologist and teaches medical students in a diagnostic lab. The [c]ourt considers Dr. Laposata's opinions on the issue of pain to be admissible pursuant to Rule 702.

*Id.* Other district courts have similarly allowed pathologists to offer limited causation opinions in pelvic mesh cases. *See Heinrich v. Ethicon, Inc.*, No. 2:20-cv-00166, 2020 WL 1914812, at *2 (D. Nev. Apr. 17, 2020) (holding that the expert was "qualified as a pathologist to opine that there is no other pathological cause for [the plaintiff's] injuries following a review of her medical records and examination of specimens of the mesh and

her tissue"); *Tyree v. Boston Sci. Corp.*, 54 F. Supp. 3d 501, 531–32 (S.D. W. Va. 2014), *as amended* (Oct. 29, 2014) (holding that the expert was qualified to opine on medical causation of the plaintiff's complications from the polypropylene mesh because the expert reached his opinion by "review[ing] pathology slides and [correlating] that with the patient's symptoms") (internal citations omitted).

In *Triant v. Amer. Med. Sys. Inc.*, No. CV-12-00450-PHX-DCG, 2020 WL 4049844, at *10 (D. Ariz. Jul. 10, 2020), the district court rejected the defendants' argument that the pathology expert in that case was not qualified to testify about the plaintiff's current injuries. The court recognized that "[a] pathologist is a clinician who provides diagnoses for patient care based on the examination of specimens they receive and relevant clinical information." *Id.* at *10 (citing *Heinrich*, 2020 WL 1914812, at *2 (additional citations omitted)). The district court noted that the expert pathologist in that case had over thirty years of experience as a pathologist, had reviewed hundreds of mesh and non-mesh pathological specimens from every organ and tissue in the body, had served on a distinguished pathology committee, and had specific experience with the pathology and injuries related to the implantation of polypropylene mesh to treat prolapse and SUI among women. *Id*. The court in *Triant* found the expert pathologist qualified to "opine about what the specimens show regarding [the plaintiff's] physical conditions, including those caused by her mesh implants." *Id*.[5]

Dr. Laposata's qualifications are partially[6] set forth in her expert report and the fact of those qualification are not challenged by Defendants. Dr. Laposata's stated task was to determine "whether adverse local tissue pathology was due to the presence of polypropylene mesh and to determine any clinicopathologic correlation of that pathology with patient symptoms." (Doc. 114-1 at 3.) Dr. Laposata "examined 4 histologic slides

---

[5] The district court in *Triant* precluded the expert pathologist's testimony on emotional harm suffered by the plaintiff in that case. 2020 WL 4049844, at *10.

[6] Dr. Laposata's expert report states that a copy of her CV with a description of her expert qualification and publications is attached as exhibit A. (Doc. 111-3 at 3.) Neither party provided the Court with exhibit A to Dr. Laposata's expert report.

stained by H&E,[7] 2 slides stained with S100[8] and slides stained with trichome[9] prepared from the tissue removed from [Plaintiff] on March 18, 2016, under a standard light microscope." (Doc. 114-1 at 10.) She also reviewed a number of medical records and materials set forth in her expert report. *Id*. at 8-9. Dr. Laposata opined "to a reasonable degree of medical certainty that the complications suffered by [Plaintiff], including dyspareunia, pelvic pain, urethral pain, and vaginal bleeding are consistent with her pathological findings and were the result of the mesh and associated tissue changes caused by the mesh." (Doc. 114-1 at 15.)

The Court is not persuaded to limit Dr. Laposata's testimony as the district court did in *Ellis v. Ethicon, Inc.* There, the district court held that "Dr. Laposata is qualified to opine on how pain is generated and whether her observations are consistent with pain." 2021 WL 4302339, at *4. The district court limited Dr. Laposata's testimony explaining that she "cannot opine that [p]laintiff's alleged conditions (*i.e.*, chronic pelvic pain and dyspareunia) are related to the mesh as she is a pathologist and not a clinical physician[.]" *Id*.

On balance, this Court is persuaded by *Meade*, *Henrich, Tyree* and *Triant* and finds that Dr. Laposata is qualified to opine about what Plaintiff's specimens show regarding her clinical complications, including whether any of Plaintiff's clinical complication were caused by her mesh. Defendants' concerns with Dr. Laposata's opinion in this regard can be addressed through cross-examination. *See e.g., Parks*, 2020 WL 6118774, at *2 (recognizing that Rule 702 contemplates a broad conception of expert qualifications and that shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion).

**2. Lack of a Control**

Defendants argue that Dr. Laposata's methodology did not involve the use of a control and is therefore unreliable. (Doc. 111 at 5.) They urge that since Dr. Laposata has

---

[7] Hematoxylin and eosin. (Doc. 114-1 at 3.)
[8] S100 antibody immunohistochemistry stain. *Id*.
[9] Mallory's trichrome. *Id*.

not compared Plaintiff's tissue slides to tissue slides from an explant of an asymptomatic patient "she cannot say that an asymptomatic patient would have displayed the same histological features she associates with [Plaintiff's] complications." (Doc. 111 at 6.) Defendants rely on *Salinero v. Johnson & Johnson*, No. 1-18-cv-23643-UU, 2019 WL 7753453 (S.D. Fla. Sep. 5, 2019) and *In re Ethicon Inc.*, 2016 WL 4582228.

Plaintiff responds that "there is no situation where a pathology sample would need to be removed from an asymptomatic patient." (Doc. 114 at 5.) She urges that there is "no need for a control sample in the field of diagnostic pathology for such opinions to be reliable." (Doc. 114 at 5.)

Dr. Laposata's methodology used in this case consisted of clinicopathologic correlation analysis which "relates changes in the body's tissues, organs, and their functions to a patient's clinical course as documented in their medical records." (Doc. 114-1 at 3.) Dr. Laposata based her opinion on her education and training, her professional experience as a pathologist, and comparing Plaintiff's histologic and pathologic findings to those in published peer-reviewed medical and scientific literature. (*Id.*; Doc. 111-4 at 9.) Dr. Laposata considered and ruled out Plaintiff's osteoarthritis, degenerative disc disease, lower back pain, and spinal stenosis as potential causes of Plaintiff's complications and symptoms. (Doc. 111-3 at 15.)

The Court is not persuaded by *Salinero*. In that case, the district court excluded Dr. Iakovlev's complication opinions that were based on his examination of explanted mesh samples. The district court found that Dr. Iakovlev's report cited to his review of "over 500 specimens of meshes explanted from the female pelvis, from the groin and the anterior abdominal wall." 2019 WL 7753453, at *9. Dr. Iakovlev testified that many of the meshes in his data pool were not made of polypropylene and "[a]t least half" were supplied to him for consultation in connection with litigation, with some meshes being supplied by the plaintiffs' attorneys. *Id*. The district also noted that "Dr. Iakovlev testified that he has had 'difficulty tracing all of' his samples 'back' to their origins." *Id*. (citing *In re Ethicon Inc.*,

2016 WL 4582228, at *4).[10]

The issue with the expert's opinion in *Salinero* was not simply the expert's lack of use of a control, but a much larger problem with the expert's reliance on data from a data pool that was plagued with issues. Here, there is no indication that Dr. Laposata's opinion suffers from the multiple flaws identified by the district court in *Salinero*.

The key *Daubert* inquiry is "whether the analysis undergirding the experts' testimony falls within the range of accepted standards governing how scientists conduct their research and reach their conclusions." *Daubert v. Merrell Dow Pharm., Inc*, 43 F.3d 1311, 1317 (9th Cir. 1995). Defendants' concerns regarding Dr. Laposata's lack of a control does not render her testimony unreliable but may be "fodder for cross-examination." *See e.g., McBroom*, 2021 WL 2709292, at *23 (denying the defendants' motion to exclude alleged unreliable expert testimony finding the flaws identified by the defendants were "fodder for cross-examination"). *See also Hangarter*, 373 F.3d at 1017 n.14 ("[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."). "The Ninth Circuit has cautioned that the Court's gatekeeping function 'is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable.'" *McBroom*, 2021 WL 2709292, at *23 (quoting *In re Toy Asbestos*, No. 19-CV-00325-HSG, 2021 WL 1201231, at *4 (N.D. Cal. Mar. 30, 2011)) (additional citations omitted.)

**3. Opinion that the TVT-O Degraded In Vivo**

Dr. Laposata testified that her review of Plaintiff's slides showed "degradation bark around the surfaces of some of the fibers." (Doc. 111-4 at 6-7.) Defendants argue that this opinion is speculative and unreliable because Dr. Laposata failed to do any chemical studies on the composition of the surface layer of the fibers. (Doc. 111 at 6-7.) They claim that Dr. Laposata's methodology is unreliable because she cannot reliably opine that Ms.

[10] *In re Ethicon, Inc*., excluded as unreliable Dr. Iakovlev's opinions on mesh explants that were not the subject of the litigation before that court because Dr. Iakovlev "could not determine the origins of many of the slides used in his reports." 2016 WL 4582228, at *4.

Thornton's mesh has degraded based solely on the observance of a "thin rim present around the circumference of the mesh." (Doc. 119 at 5-7.) Plaintiff responds that Dr. Laposata "should be permitted for (*sic*) opine that she saw signs consistent with degradation[.]" (Doc. 114 at 8.) Plaintiff relies on *Ellis* and *Meade*. *Id*.

*Ellis* and *Meade* did not address the reliability of Dr. Laposata's methodology. As mentioned above, in *Ellis*, Ethicon challenged Dr. Laposata's opinion on the grounds that she was not qualified to opine on mesh degradation. 2021 WL 4302339, at *3. The same challenge was lodged in *Meade*. *See Meade*, 2020 WL 639581, at *8 (finding that "Dr. Laposata's work, training, and the literature for her field qualify her to opine on the possible degraded mesh in bodily tissue and the properties of that mesh").

As explained below, however, the Court is not convinced by Defendants' argument that Dr. Laposata's methodology is unreliable. Rule 104(a), Fed. R. Evid., requires the proponent of the expert testimony to show by a preponderance of the evidence that the proposed testimony is admissible under Rule 702. Expert opinion evidence is admissible when it "rests on a reliable foundation and is relevant." *Daubert*, 509 U.S. at 597. Relevant to her opinion that she saw signs consistent with bark degradation, Dr. Laposata testified:

> Q. Are there any features you can describe today that you used in determining and identifying that the layer was degraded surface polypropylene material?
> A. I can identify it as that based on matching the appearance on the histologic slides that I see with the published literature of the appearance of the degraded surface polypropylene and the other literature which completed analysis of that.
> Q. Now, if someone did not have the photo in front of them and you were trying to describe to them the layer, what matching appearance does this layer have that matches up with the literature?
> A. A thin circle of blue-ish material circumferential.
> Q. Any other features?
> A. No.
> Q. And is that the thin layer consistent with the thin layers you have seen in literature you've cited in your reliance list?
> A. Yes.
> Q. And have you done anything to rule out whether that layer contains proteins?
> A. I did not do any chemical studies in the composition of the layer.

Q. And would you agree that that layer could contain proteins?
A. Oh, I'm sure there are some proteins in it, yes.
Q. Are you able to determine what proportion of that layer is protein?
A. Not from histology.
…
Q. Have you done anything to confirm that that layer contains oxidized polypropylene?
A. No, that's not part of a histologic examination.
Q. And did you undertake any efforts to remove protein from that outer layer?
A. No, I did not.
Q. Is it fair to say that you're basing your opinion that Ms. Thornton's mesh had degraded based on visual observation alone?
A. And the literature.
…
Q. In order to match the appearance of the layer in Ms. Thornton's mesh that you described as degraded surface polypropylene material, did you use any methods other than visual observation to match it to the literature?
A. My experience and training in histology and tissues and materials.
Q. … To identify the characteristics of the layer that you've identified as degraded surface polypropylene as matching the appearance of degraded polypropylene in the literature, did you do anything other than look at the mesh?
A. It's my training and experience that allows me to interpret histologic and pathologic findings under the microscope.
…
Q. Getting back to page 9, is there anything else of significance in the histology shown here for the purposes of your opinions?
A. No, just the fact that it appeared at ten years of implantation there's still an exuberant chronic foreign body reaction to the mesh.
Q. And did this inflammation that's seen in the photomicrograph here, was it confined to the area around the mesh fibers?
A. Yes, as you see here.

(Doc. 114-2 at 27-32.)

While Defendants claim that Dr. Laposata relied upon "unidentified" published literature, Dr. Laposata testified that the thin layer is consistent with the thin layers that she has seen in literature that is cited in her "reliance list." Dr. Laposata's testimony was accepted by counsel without further questioning. This colloquy suggests that Defendants are aware of the literature that Dr. Laposata relied upon but chose not to directly attack the sufficiency of the literature and Dr. Laposata's reliance on it. *See e.g., McBroom*, 2021 WL

2709292, at *3 (declining to exclude expert's opinions where there was, *inter alia*, evidence that the expert prepared a reliance list that included hundreds of medical literature references and the party seeking exclusion did not address the literature the expert relied on in forming his opinions).

Defendants also point out that Dr. Laposata did not rule out alternative explanations for her histological finding or confirm that the thin rim present on the surface of the mesh represented oxidized polypropylene consistent with degradation. Dr. Laposata testified that she did no such testing because that is not a part of the histologic examination. Defendants have offered nothing to dispute Dr. Laposata's testimony that such testing is not part of the histologic examination. While Dr. Laposata's opinion may be impeached because she did not perform testing, the fact that her testimony may be impeached does not render it inadmissible. *See e.g.*, *McBroom*, 2021 WL 2709292, at *23 (recognizing that the court's gatekeeping function is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable).

"Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Cooke v. City of Stockton*, No. 2:14-CV-00908-KJM-KJN, 2017 WL 6447999, at *2 (E.D. Cal. Dec. 18, 2017) (quoting *City of Pomona v. SQM N. Am. Corp*., 750 F.3d 1036, 1044 (9th Cir. 2014) (citation omitted)). The district court must screen out "unreliable nonsense opinions," but the jury may hear and weigh expert opinions that are impeachable. *Cooke*, 2017 WL 6447999, at *2 (quoting *City of Pomona*, 750 F.3d at 1044). In other words, the district court does not determine whether the expert is right or wrong, but whether the testimony would be helpful to the factfinder. *Cooke*, 2017 WL 6447999, at *2 (citing *City of Pomona*, 750 F.3d at 1044).

The Court finds that Dr. Laposata's opinion on mesh degradation is based on a sufficiently reliable methodology and is admissible.

/ / /

**4. Pain/Differential Diagnosis**

Defendants seek to preclude Dr. Laposata's opinions that Plaintiff suffered persistent pain after the mesh placement and vaginal bleeding caused by the TVT-O device. (Doc. 111 at 7-8.) Defendants argue that Dr. Laposata "admits that [Plaintiff's] history showed no evidence of vaginal bleeding" and that Dr. Laposata admits she cannot determine whether any of the nerves found in Plaintiff's slides were capable of sending pain signals. (Doc. 111 at 7-8.) They also argue that Dr. Laposata did not perform a proper differential diagnosis and did not rule out Plaintiff's prior medical conditions as potential causes of her complications and symptoms. *Id*.

Plaintiff responds that Dr. Laposata explained in her report that "[p]ersistent pain after mesh placement can result from placement of mesh through or near nerve branches of pelvic nerves" and that Dr. Laposata reviewed Plaintiff's pathology slides and concluded that the "[n]erves encased in fibrous tissue are stimulated and cause unnecessary pain." (Doc. 114 at 8.) Regarding vaginal bleeding, Plaintiff states that Dr. Laposata's trial testimony will be consistent with her deposition testimony that, while Plaintiff's medical records show that she experienced vaginal bleeding, there was no indication of vaginal bleeding in the histology slides. *Id*. at 9 n.4. Finally, she contends that Dr. Laposata performed a proper differential diagnosis by considering and ruling out Plaintiff's prior medical conditions. *Id.* at 8-9.

The Court has already determined that Dr. Laposata is qualified to testify as to pain. S*ee*, pp. 7-9, *supra*. Regarding persistent pain after mesh placement, Dr. Laposta testified:

> I found that there was degradation bark around the surfaces of some of the fibers. They were encased in fibrous tissue. There were multinucleated giant cells. Again, a very robust chronic inflammatory response indicating to me that the tissue - - or the mesh did not integrate well. And then I also found small nerve fibers which weren't in an environment of fibrous tissue and extremely close to the mesh fibers, which is an environment which any involuntary or voluntary movement could stimulate those nerves and cause physical sensations in the patient.

(Doc. 111-4 at 7.) Defendants may impeach Dr. Laposata's testimony in this regard by

pointing out to the jury, as they do to the Court, that Dr. Laposata also testified that she was not able to identify any nerve receptors because they are below the resolution of light microscopy. (Doc. 111-4 at 7 ("Q. Did you identify any nerve receptors in this case? A. No. Those are below the resolution of light microscopy.")). Defendants' motion to preclude Dr. Laposata's opinion that persistent pain after mesh placement resulted from the placement of mesh through or near nerve branches or pelvic nerves will be denied. Plaintiff concedes that Dr. Laposata will not testify that Plaintiff's slides indicated vaginal bleeding. Defendants' motion on this point will be denied as moot.

"The goal of a differential diagnosis is to determine the cause of a medical issue." *Howard v. Ethicon Inc.*, 472 F. Supp. 3d 559, 562 (D. Ariz. 2020). "First, the doctor must compile a list 'ruling in' all sources generally capable of causing the injury." *Howard*, 472 F. Supp. 3d at 562 (quoting *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1057 (9th Cir. 2003), *as amended on denial of reh'g* (Sept. 25, 2003)). "Second, he 'rules out' possible sources of the injury, explaining his reasoning." *Howard*, 472 F. Supp. 3d at 562 (quoting *Clausen*, 339 F.3d at 1057). "The process is unreliable if he does not consider a source generally capable of causing the injury. *Howard*, 472 F. Supp. 3d at 562 (quoting *Clausen*, 339 F.3d at 1058). "It is also unreliable if a doctor rules in a source that is generally unlikely to cause the injury." *Howard*, 472 F. Supp. 3d at 562 (quoting *Clausen*, 339 F.3d at 1058). When a doctor follows the proper process, it is reliable and thus admissible under *Daubert*. *Howard*, 472 F. Supp. 3d at 562 (citing *Clausen*, 339 F.3d at 1057). However, "a district court is justified in excluding evidence if an expert 'utterly fails … to offer an explanation for why the proffered alternative cause' was ruled out." *Clausen*, 339 F.3d at 1058 (quoting *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001)). "The expert must provide reasons for rejecting alternative hypothesis 'using scientific methods and procedures and the elimination of those hypothesis must be founded on more than 'subjective beliefs or unsupported speculation." *Clausen*, 339 F.3d at 1058 (quoting *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994)) (internal quotations omitted).

Here, Dr. Laposata testified:

Q. …[Y]ou report part of a differential diagnosis, or at least your findings from a differential diagnosis, is that correct?
A. Her other medical conditions.
Q. Okay. Did you perform a differential diagnosis in this case?
A. Yes.
Q. All right. And how did you perform that? How did you go about doing that?
A. I thought about it and considered whether anything else other than the mesh could – and the tissue response to the mesh could have caused her problems that we just went over.
Q. Okay. And let's take dyspareunia first. What did you consider?
A. Whether she had cancer or any sort of massive infection that would cause that.
D. Did you consider any other – anything else in her medical history?
A. I considered everything I read in her medical history.
Q. Okay. Was there anything of significance that you recall that you considered and then subsequently ruled out for dyspareunia?
A. Not other than what I've listed here right now.
Q. How about for pelvic pain, what did you consider?
A. The answers would be the same.
Q. Okay. For both of those, for pelvic pain and for dyspareunia, did you undertake an analysis to determine whether either of those conditions preexisted the implantation of the TVT-O?
A. I just read the medical record, and that was not particularly significant to me.
Q. Okay. And so if I understand your testimony, it was not particularly significant to you whether the plaintiff suffered from dyspareunia or pelvic pain prior to the implantation of the TVT-O, is that correct?
A. Not in the sense that […] the surgery was an attempt to correct some of those preexisting symptoms and problems, and it did not successfully correct those in the long term.
Q. Okay. Did you determine – in the course of your differential diagnosis regarding dyspareunia and pelvic pain, did you determine whether or not Ms. Thornton had suffered from that prior to implantation of TVT?
A. That would not be important.
Q. Okay. For urethral pain, did you consider that any differently, or is it similar to what we just described?
A. It's a similar thought process and consideration.
A. And in terms of dyspareunia, pelvic pain, or urethral pain, did you consider – or undertake an analysis to determine the quality of that pain and whether that pain had changed over time?
A. No.

(Doc. 111-4 at 14.)

Dr. Laposata testified that she "thought about it and considered whether anything else other than the mesh could . . . have caused her problems . . . " *Id.* She testified that she considered whether Plaintiff had a prior cancer diagnosis or massive infection that could have caused her problems. Defendants claim that Dr. Laposata testified that it was not significant to her whether Plaintiff suffered dyspareunia or pelvic pain prior to implantation of Defendants' TVT-O device. (Doc. 111 at 8.) When read in context, however, Dr. Laposata's testimony was that it was not significant to her "in the sense that the surgery was an attempt to correct some of those preexisting symptoms and problems, and it did not successfully correct those in the long term." (Doc. 111-4 at 14.)

Additionally, although Dr. Laposata testified that she did not determine whether Plaintiff suffered from dyspareunia and pelvic pain prior to implantation of the TVT-O, nor did she consider whether the quality of Plaintiff's pain changed over time, the Court finds that such testimony does not render her opinion inadmissible. Rather, Defendants may cross-examine Dr. Laposata about this. In sum, the Court finds that Plaintiff has shown by a preponderance of the evidence that Dr. Laposata properly performed a differential diagnosis. *See Howard v. Ethicon, Inc.*, 472 F. Supp. 3d 559, 562-63 (D. Ariz. 2020) (finding that expert performed a proper differential diagnosis where expert acknowledged the plaintiff's "prior complaints of pain during intercourse from decades ago and concluded that given her partial hysterectomy, the dyspareunia that she currently experiences is unrelated to her past complaints[,]" where expert eliminated other possibilities and "concluded that [the plaintiff's] pelvic injuries were caused by the defective [mesh] device"). Defendants' motion on this point will be denied.

/ / /

/ / /

/ / /

/ / /

/ / /

## V. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED DENYING** Defendants' motion to exclude the expert opinion of Dr. Elizabeth Laposata (Doc. 111).

Dated this 9th day of August, 2022.

Honorable John C. Hinderaker
United States District Judge